



U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 14, 2008**                                                   **United States Bankruptcy Judge**

___

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **Patman Drilling International, Inc.** | § | Case No. 07-34622-SGJ |
| | § | |
| | § | |
| **DEBTOR** | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING MLC'S MOTION FOR APPOINTMENT OF CHAPTER 11 TRUSTEE

Merrill Lynch Capital, a division of Merrill Lynch Business Financial Services Inc. ("MLC"), a secured creditor of Patman Drilling International, Inc. (the "Debtor" or "PDI") and party in interest in this case, filed a Motion for Appointment of a Chapter 11 Trustee (the "Motion to Appoint Trustee").[1] The Court heard the Motion to Appoint Trustee on March 4 and 5, 2008, and makes the following findings of fact and conclusions of law:[2]

___

[1] Bankruptcy Docket # 179.

[2] The Court reserves the right to supplement or amend these findings of fact and conclusions of law. When appropriate, findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact. FED. R. BANKR. P. 7052; FED. R. BANKR. P. 9014(c).

### Jurisdiction and Venue

1. The Court has jurisdiction to consider the relief requested in the Motion to Appoint Trustee under 28 U.S.C. § 1334(b) and the standing order of reference of the District Court. This matter is a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

### FINDINGS OF FACT

### The Debtor's business

2. PDI, founded in 2005, is a Texas corporation that owns drilling rigs. PDI's business is to drill wells for oil-and-gas exploration-and-production companies. Michael Patman and his brother David Pat Patman (collectively, the "Patmans") are, respectively, the chief executive officer and chief operating officer of PDI.

3. On September 25, 2007 (the "Petition Date"), PDI filed a voluntary petition under Chapter 11 of the Bankruptcy Code.

4. The Debtor currently owns seven rigs. These rigs have been used mostly for natural-gas drilling on the Barnett Shale in Texas. Testimony indicates that the rigs are all operational, fairly new, state of the art, and have a larger capacity than many of the approximately 2,500 rigs available in the U.S. market.

5. Certain appraisals value the Debtor's seven rigs at over $70 million, which is greater than the amount of the Debtor's secured debt. But the Debtor's most recent appraisal,[3] dated February 29, 2008, shows that the rigs' liquidation value may not be worth much more than the value of the accruing debt secured by certain of the rigs. The February 29, 2008 appraisal

---

[3] Debtor's exhibit 3.

suggests that the Debtor's seven rigs have a fair-market value of approximately $51 million and a liquidation value of approximately $46 million.

6. The Debtor has had the problem of significant under-utilization of its seven rigs during its brief two-and-a-half years of operations. At any point in the Debtor's history, only one to three rigs have been under contract and producing revenue. More often, only one to two rigs are under contract.

7. Natural-gas prices have increased significantly during this Chapter 11 case and are likely to increase further, which should lead to increased drilling activity in the Barnett Shale. This could improve the Debtor's rig utilization. However, there is a glut of approximately 700 idle rigs in the U.S. market, and the Debtor presented no persuasive evidence that it will soon enter into lucrative drilling contracts for its idle rigs.

8. The Debtor's post-petition monthly operating reports show continued operating losses of more than $300,000 per month, not taking into account depreciation or payments for debt service or adequate protection.

## The Motion to Appoint Trustee

9. MLC filed the Motion to Appoint Trustee on January 9, 2008. Notice was properly served for the Motion to Appoint Trustee and the hearing on the Motion to Appoint Trustee. Banc of America Leasing & Capital, LLC ("BoA") filed a joinder[4] to the Motion, as did William G. Lionetta and twenty-nine similarly situated creditors (the "Lionetta Plaintiffs").[5] The Debtor and the Official Committee of Unsecured Creditors (the "Committee") filed objections to the Motion.[6]

---

[4] Bankruptcy Docket # 245.

[5] Bankruptcy Docket # 219.

[6] Bankruptcy Docket # 239 and # 268.

10. MLC, BoA, and the Lionetta Plaintiffs (collectively, the "Movants") have standing to seek the appointment of a Chapter 11 Trustee, and represent a significant majority of the creditor body, holding well over $40 million worth of secured and unsecured debt.

11. MLC, the Debtor's largest secured creditor, asserts a claim exceeding $28 million secured by five of the Debtor's rigs. BoA asserts a claim exceeding $2.5 million secured by one of the Debtor's other rigs. No objections to MLC's or BoA's proofs of claim have been filed. No entity claims any lien on the remaining seventh rig.

12. The Lionetta Plaintiffs filed pre-petition a lawsuit against the Debtor, Sundance Resources, Inc. ("SRI"), and the Patmans based in part on alleged fraudulent transfers between SRI and the Debtor. The Lionetta Plaintiffs filed multiple proofs of claim against the Debtor totaling more than $12 million. Objections have not been filed to those proofs of claim.

13. The Committee consists of four members: Shandong Afthonia, Inc.; All Star Pump & Supply; Vortex Fluid Systems, Inc.; and Litmus Consulting. The Committee members hold about $3 million of trade debt. Credible evidence indicates that one member of the Committee may be controlled by a possible insider of the Debtor, and that at least one Committee member continues to do business with the Debtor post-petition.

### Conflicts of Interest

14. Large transactions (in both number and amount) between the Debtor and insiders warrant immediate investigation and may result in litigation. The current board and management of the Debtor are not the appropriate parties to pursue that investigation and potential litigation because of conflicting loyalties with regard to those transactions.

### Conflicts of Interest: the Debtor and SRI

15. The Debtor's fiduciary duties owed to the bankruptcy estate include the duty of loyalty, which precludes the Debtor's directors and officers from engaging in self-dealing.

16. One of the most significant insider relationships that has characteristics of self-dealing involves SRI. SRI is an oil-and-gas exploration-and-production company owning oil-and-gas leases and interests worth millions of dollar. SRI contracted to receive drilling services from the Debtor.

17. Each Patman brother owns or controls 35% of SRI. Approximately 700 other investors or shareholders own a minority stake in SRI. The Patmans also own or control 70% of the Debtor.

18. Michael Patman is the CEO of the Debtor and SRI. David Pat Patman is the COO of the Debtor and SRI. SRI operates out of the same office building as the Debtor. SRI and the Debtor also share the same phone number, same computer system, and same accounting personnel.

19. SRI solicited the Lionetta Plaintiffs to invest millions of dollars in SRI, with the expectation that their money would be used to buy drilling rigs to be owned by SRI or a SRI subsidiary. The rigs purchased with the Lionetta Plaintiffs' loans were to be within the SRI ownership structure. The Debtor is not a subsidiary of SRI.

20. In the spring of 2007, SRI hired Jay Krasoff with Chiron Financial Advisors, LLC as a financial consultant. Mr. Krasoff, whose testimony the Court found very credible, determined that SRI was insolvent and that hard assets had been moved off of SRI's accounting records. SRI had transferred drilling rigs worth several millions of dollars each to the Debtor, which apparently include some of the seven rigs currently owned by the Debtor.

21. Evidence of the consideration received by SRI for the transfer of rigs to the Debtor was not corroborated nor credible. There is no fairness opinion by an outside consultant,

and no evidence of board or shareholder approval related to the transfer of rigs from SRI to the Debtor.

22. The key officers of the Debtor, the Patmans, have conflicting interests with respect to the multi-million-dollar transfers between the Debtor and SRI. As board members and management of SRI, the Patmans owe fiduciary duties to SRI's business enterprise and its creditors. At the same time, the Patmans also owe fiduciary duties to the Debtor and the Debtor's creditors. The Patmans are incapable of independently investigating and pursuing potential causes of action arising out of inter-company transfers between SRI and the Debtor.

### Conflicts of Interest: SRI and the Patmans

23. The credible evidence shows that the Patmans borrowed $3.7 million from SRI in October 2005 to make their initial capital contribution to the Debtor. Mr. Krasoff, whose testimony the Court found very credible, became troubled that no board resolutions or documented board or shareholder meetings approved or ratified the $3.7 million loan to the Patmans. According to SRI's accounting records, the loan was discharged in December 2006 or January 2007. Mr. Krasoff testified that the loan was later treated as a distribution of capital to the Patmans. The discharge of the Patmans' $3.7 million loan from SRI is troubling because (*i*) it appears SRI was insolvent at the time the loan was discharged; (*ii*) the Patmans' ownership stake in SRI was not reduced; and (*iii*) the discharge of the loan was not disclosed to other SRI shareholders and investors.

### Conflicts of Interest: Leases with Insiders

24. The Debtor leases various properties from the Patmans and/or family members of the Patmans. These leases merit scrutiny by independent management.

25. Michael Patman leased a jet airplane to the Debtor. Pre-petition, Michael Patman charged the Debtor $1,200 per flight hour for the use of the plane. The Debtor's statement of financial affairs[7] shows that the Debtor paid $138,200 to Michael Patman for the Debtor's use of the plane in the year before the Petition Date. Given the level of drilling activity by the Debtor, the likely travel involved in procuring additional drilling contracts, and the comparable costs of flying on a commercial airline, it is difficult for the Court to find reasonable the $138,200 in lease payments from the Debtor to Michael Patman for the use of the plane.

26. The Debtor leases office space from SRI. The Debtor leases a welding shop and pipe yard from Beverly Patman, the wife of David Patman. The Debtor also leases additional property from PC Investments, which is owned by the Patmans and another board member of the Debtor. The Debtor is not paying any post-petition debt service to MLC or BoA. Nevertheless, the Debtor sought to assume these leases,[8] which would guarantee additional payments from estate funds to family members of the Debtor's board members.

### Excessive Compensation

27. Michael Patman draws a post-petition annual salary of $385,000 from the Debtor. Pre-petition, Michael Patman drew an annual salary of $109,000 from the Debtor. Michael Patman also takes an annual salary of $150,000 from SRI.

28. David Patman draws a post-petition annual salary of over $200,000 from the Debtor. The year before the bankruptcy filing, David Patman drew only $59,230 in salary from the Debtor. David Patman also takes an annual salary of $100,000 from SRI.

29. These salaries are excessively high and imprudent for a company in the Debtor's current financial condition, and of the Debtor's size in the Debtor's industry. The dramatic

---

[7] MLC exhibit 2.

[8] Bankruptcy Docket # 204.

increase in the Patmans' salaries paid post-petition reflects adversely not just on the conflicts-of-interest issue but also on the Patmans' integrity and honesty.

### Conflicts of Interest: the Debtor and PJ's Oilfield Services

30. PJ's Oilfield Services ("PJ's") is owned by the Patmans, Caine Patman (son of David Patman), and Tony Cashion (a Debtor board member). PJ's performs rig-mobilization work, *i.e.*, moving rigs to new well locations. PJ's performs rig-mobilization work for the Debtor and other unrelated companies, and is primarily operated by Caine Patman.

31. The Debtor paid PJ's $210,000 post-petition. The evidence suggests that the Debtor paid PJ's $150,000 in the weeks before the Petition Date, and $70,000 in October 2007. Trucks were also transferred between the Debtor and PJ's shortly before the Petition Date. The Patmans are not the appropriate parties to determine the fairness or reasonableness of these transfers because of their divided loyalties to the Debtor and PJ's.

### Conflicts of Interest: post-petition events

32. The Debtor has not filed any adversary proceeding against SRI relating to the rigs, as it promised it would early in the case, with regard to issues concerning the Lionetta Plaintiffs. The Debtor has also not provided a transparent accounting of the various large insider transactions to determine whether any of them are actionable under 11 U.S.C. § 544, § 548, or otherwise. Additionally, the Debtor and its insiders, SRI and the Patmans, have mightily resisted valid discovery efforts under Bankruptcy Rule 2004.

### Incompetence and/or gross mismanagement of the Debtor's affairs

33. Michael Patman either lacks competence to manage, or is mismanaging, the Debtor's affairs. Michael Patman conspicuously never testified in this case until the hearing on the Motion to Appoint Trustee. He had an alleged medical emergency in the middle of his

testimony and never returned to the hearing. Debtor's counsel never urged a continuance. The Court believes Michael Patman did not feel comfortable providing sworn testimony in this court and that he did not want to come back and face further examination by the Debtor's creditors.

34. Michael Patman was either less than forthcoming in his testimony, or not as knowledgeable about the Debtor as a person drawing a $385,000 annual salary should be. Michael Patman attempted to explain the benefits of the insider-transactions discussed above, but the Court found his testimony unconvincing.

35. Michael Patman had no idea of the contents of the Debtor's filed plan.[9] The Debtor's board of directors has not held a meeting since the Petition Date. The Debtor's board of directors did not approve the filed plan. Michael Patman participated in virtually no negotiations with the Debtor's lenders during the five-and-a-half months this case has been pending. Five-and-a-half months is ample time for the Debtor to negotiate a potentially confirmable plan. No disclosure statement was filed with the plan. Michael Patman did not know if the Debtor had prepared a disclosure statement yet.

36. Michael Patman did not know if the Debtor was a party to the Lionetta lawsuit. He could not remember if the Debtor was formed in 2005 or 2006. He is not very conversant about the Debtor's or SRI's debt structure. He cannot remember if PDI ever issued notes to SRI for the transfer of the rigs.

37. The Debtor has not, under current management, been able to lease out its rigs domestically at a reasonable level, even though the Barnett Shale is the largest natural-gas discovery in the U.S. in recent years. Nevertheless, Michael Patman testified about possibly deploying the Debtor's rigs to Syria, Libya, and the United Arab Emirates, which would violate

---

[9] MLC exhibit 1.

the terms of the Debtor's loan documents. The Court found no credible evidence that international deployment of the Debtor's rigs would be a viable or prudent strategy. The Debtor's notion of international deployment of rigs is additional evidence of some combination of incompetence and/or gross mismanagement.

38. The Debtor has lost and is losing money at a phenomenal rate. Chuck Watson, an investor, contributed $10 million to the Debtor approximately 8 to 9 months before the bankruptcy filing.[10] At the time of the bankruptcy filing, the Debtor had approximately $600,000 of cash. Sonya Ayers, the Debtor's CFO, suggested that some of the $10 million may have gone to SRI, but she was not sure of the amount. The Debtor has post-petition monthly operating losses of approximately $300,000, before taking into account depreciation, debt service, or adequate-protection payments.

## CONCLUSIONS OF LAW

### Standards governing the appointment of a Chapter 11 Trustee

39. The Bankruptcy Code provides that any time prior to confirmation, the Court shall order the appointment of a Chapter 11 trustee upon request by a party in interest: (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after commencement of the case; (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate (without regard to the number of holders of securities or the amount of assets or liabilities); or (3) if grounds exist to convert or dismiss under section 1112, but the appointment of a trustee instead is in the best interests of creditors and the estate. 11 U.S.C. § 1104(a).

---

[10] *See* MLC exhibit 30, page 5.

40. Grounds under § 1112 relevant to this case include substantial or continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation, and gross mismanagement of the estate. 11 U.S.C. § 1112(b)(4).

41. Appointment of a Chapter 11 trustee is a draconian remedy. A strong presumption exists that a Chapter 11 debtor should be permitted to remain in possession. The Movants have the burden of showing, by clear and convincing evidence, that the appointment of a trustee is justified.

## "Cause" exists under § 1104(a)(1) to appoint a Chapter 11 Trustee

42. The Movants have established by clear and convincing evidence that "cause" exists under § 1104(a)(1) for the appointment of a trustee, and that the appointment of a trustee is in the "best interests" of parties under § 1104(a)(2).

43. "Cause" exists in this case because of the overwhelming conflicts of interest of the Debtor's management, as well as clear and convincing evidence of some combination of dishonesty, incompetence, or gross mismanagement of the affairs of the Debtor by the Patmans.

44. The Court finds relevant *In re Cajun Elec. Power Co-op, Inc.*, 69 F.3d 746, 749 (5th Cir. 1995), *withdrawn in part on rehearing*, 74 F.3d 599 (5th Cir. 1996) (withdrawing section IV and adopting reasoning of dissent in prior opinion), *cert. denied*, 519 U.S. 808 (1996). In *Cajun*, the Fifth Circuit affirmed the appointment of a Chapter 11 trustee because the debtor's board members had irremediable conflicts of interest.

45. The conflicts of interest and instances of gross mismanagement, apparent incompetence,[11] continuing losses, and acrimonious relationships between Debtor's management and creditors discussed above provide overwhelming cause for the appointment of a trustee.

---

[11] The Court notes that none of its concerns or findings of mismanagement or incompetence are directed at Sonya Ayers, who only joined the Debtor in the middle of 2006, and was later appointed CFO.

**Appointment of a Chapter 11 Trustee is
in the best interests of creditors and the estate under § 1104(a)(2)**

46.  The Court also finds that, based on the findings of fact discussed above, appointment of a trustee is in the best interests of creditors and the estate under 11 U.S.C. § 1104(a)(2).  The vast majority of creditors, holding well over $40 million in claims, are supporting the appointment of a trustee.  This majority of the Debtor's creditor body has lost confidence in the Debtor's management, who have been unable to stem continuing post-petition losses.

47.  A final order granting the Motion has been entered separately.[12]  *See Cajun*, 69 F.3d at 748.

# # # END OF FINDINGS AND CONCLUSIONS # # #

Dallas_1\5183069\4
40032-22 3/13/2008

---

[12] Bankruptcy Docket # 285.